UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE ALCANTARA, | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| -against- | Jury Trial Demanded |
| BED BATH & BEYOND INC. and KELLIE MARSALLI, | |
| Defendant. | |

Plaintiff, by his attorneys, Slater Slater Schulman LLP, complaining of Defendants, respectfully alleges, upon information and belief, the following:

## NATURE OF THE ACTION

1.      Plaintiff Jose Alcantara was employed by Defendants as a department manager at the retail store Bed Bath and Beyond, located at 1932 Broadway, New York, New York, from approximately October 1, 2012 through January 7, 2014.

2.      Plaintiff brings this action against Defendants to seek redress for deprivation of Plaintiff's rights afforded under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Human Rights Law, for discriminatory acts in which Plaintiff was subjected to a hostile work environment, retaliated against, denied a raise and promotion, and terminated based upon his religion.

3.      "Good morning terrorist", "come here terrorist", "how are you terrorist", were some of the routine statements made to Plaintiff throughout his employment at Bed Bath & Beyond based upon his status as a practicing Muslim. Despite numerous requests to be called by his first name "Jose", and multiple complaints to the Human Resources Department and upper

management, Plaintiff continuously endured the title of "terrorist" from a supervisor and training manager at Bed Bath & Beyond. In response to his complaints, Plaintiff was told that the nickname "terrorist" was "just a joke" and not to worry about it. Thereafter, Plaintiff worked in complete humiliation as he was called "terrorist" in front of management, sales-floor associates and customers. In fact, Plaintiff was called a "terrorist" so often that even several sales-floor associates became comfortable calling him the same.

4.      Not only was Plaintiff branded with the nickname "terrorist" based upon his religion, Plaintiff was subject to scrutiny and questioning regarding his practice as a Muslim. This included being called into Human Resources and interrogated/asked "about the Muslim thing, are you seriously following the Muslim religion?" and being asked by the employees who regularly called him terrorist "why don't you believe in God?" and "why aren't you Christian or Catholic?".

5.      In or about February 2013, while his mother in law was terminally ill from cancer, Plaintiff had grown his beard to a fist in length according to Muslim practice. Prior to this, the store manager of Bed Bath & Beyond, Defendant Kellie Marsalli (hereinafter referred to as "Marsalli"), was cordial and friendly to Plaintiff showing Plaintiff pictures of her cat, "Mr. Whiskers", and discussing with Plaintiff on numerous occasions promoting him to a senior management position. After growing his beard, Plaintiff became a prime target for harassment and discrimination by Defendant Marsalli.

6.      The pervasive harassment and targeting by Defendant Marsalli included directing Human Resources to question Plaintiff on two occasions about his beard, in which it was stated to Plaintiff "what's going on with the beard thing?" and "Kellie keeps harassing me about the beard", despite notice that Plaintiff's beard was a fundamental part of Muslim practice. Further, Defendant

Marsalli became extremely hostile with Plaintiff routinely and unfairly criticizing Plaintiff's work and giving Plaintiff assignments set up for Plaintiff to be unable to accomplish.

7.      When Defendant Marsalli's constant harassment failed to cause Plaintiff to resign, Defendant Marsalli took matters into her own hands. First, Defendant Marsalli forced a senior manager to re-write a performance evaluation for being "too fair" and even re-wrote sections herself. Thereafter, Defendant Marsalli's egregious acts culminated when, upon information and belief, she changed Plaintiff's schedule by hand while he was on vacation to schedule Plaintiff's return to work three days earlier than originally scheduled, and therefter terminated Plaintiff for being a no call no show.

## PARTIES

8.      Plaintiff was and still is a resident of the State of New Jersey.

9.      At all relevant times, Plaintiff worked at the premises commonly known as Bed Bath & Beyond, located at 1932 Broadway, New York, New York 10023 (hereinafter referred to as "BB&B Broadway").

10.      Plaintiff is a covered employee within the meaning Title VII, 42 U.S.C. § 2000e *et seq.*, New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

11.      Defendant Bed Bath & Beyond Inc. (hereinafter referred to as "BB&B Inc.") was and still is a domestic corporation organized and existing by virtue of the laws of the State of New York.

12.      Bed Bath & Beyond (hereinafter referred to as "BB&B") is a chain of retail stores selling houseware items located throughout the United States.

3

13.     Defendant BB&B Inc. was and still is the owner and/or operator of the BB&B retail store chain.

14.     Defendant BB&B Inc. was and still is the owner and/or operator of BB&B Broadway.

15.     At all relevant times, Defendant BB&B Inc. employed more than ten thousand (10,000) employees.

16.     Defendant Kellie Marsalli was and still is a resident of the State of New York.

17.     Defendant Marsalli was and still is the store manager of BB&B Broadway and was Plaintiff's direct supervisor throughout his employment.

18.     Defendants are covered employers with the meaning of Title VII, 42 U.S.C. § 2000e *et seq.*, New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

### EEOC

19.     On or about April 14, 2014, Plaintiff filed a Verified Charge with the Equal Employment Opportunity Commission ("EEOC").

20.     Plaintiff's Verified Charge set forth Defendant's unlawful employment discrimination practices based upon Plaintiff's religion, including creating a hostile work environment, retaliating against Plaintiff for engaging in protected activity and terminating Plaintiff based upon his religion and/or in retaliation for engaging in protected activity.

21.     The EEOC assigned Charge Number 520-2014-01633 to Plaintiff's Verified Charge.

22.     On or about July 7, 2015, the EEOC determined that Defendant's proffered basis for terminating Plaintiff was not true and that Defendant discriminated against Plaintiff based upon

his religion.

23.    On or about September 5, 2015, Plaintiff was issued a Right to Sue letter by the EEOC. Copies of the Right to Sue letter are attached.

## VENUE

24.    This Court has jurisdiction based upon federal question and pursuant to the Constitution of the United States, 42 U.S.C. §§ 1331 and 1343; Title VII, 42 U.S.C. § 2000e *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and; the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

25.    This Court has supplemental jurisdiction of the claims arising under the New York State Human Rights Law and New York City Human Rights Law pursuant to 28 U.S.C. § 1367, in that the New York State and New York City law claims are so closely related to Plaintiff's Title VII claims as to form the same case or controversy under Article III of the United States Constitution.

26.    Venue is proper in this judicial district under 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the claims occurred in this judicial district, and Defendants conduct business through their employees, including Plaintiff, within this judicial district.

27.    Compensatory and punitive damages are sought pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

28.    Costs and attorney's fees may be awarded pursuant to 29 U.S.C. § 621 *et seq.*, and Rule 54 of the Federal Rules of Civil Procedure.

## FACTS

### *Plaintiff's Religious and Employment Background*

29.     A three time cancer survivor, Plaintiff Jose Alcantara is a thirty-eight (38) year old father of one son and resides with his son and fiancé in New Jersey. Plaintiff was raised by his family under the Islamic faith and has been a practicing Muslim throughout his life.

30.     Plaintiff has spent much of his life working in management in the retail industry. During the 1990's, Plaintiff spent four years working for the retail clothing store Macy's as a manager. Plaintiff resigned from this position after developing cancer. After going into remission, Plaintiff worked at the home improvement and construction retail store Home Depot as a supervisor and/or manager from March 2004 through September 2012.

31.     During his employment at Home Depot, Plaintiff was one of numerous Muslim employees who maintained a beard at the length of a fist or longer as part of Muslim practice. According to the sacred tenets of Islam, each male shall have a beard which shall be maintained no shorter than a fist in length. Plaintiff was never questioned at any time in the course of his employment at Home Depot regarding his beard.

32.     While working at Home Depot, Plaintiff endured his third bout of cancer in which he developed Squamous Cell Carcinoma of his mouth and throat. Plaintiff resigned while in remission in September 2012.

### *Interview with Bed Bath & Beyond: September 2012*

33.     In mid-September 2012, Plaintiff was contacted by Michelle Brown who had previously worked with Plaintiff at Home Depot.

34.     Ms. Brown advised Plaintiff that she was working in Human Resources at Bed Bath & Beyond. Ms. Brown asked Plaintiff if he would be interested in a management position at BB&B

Broadway as a Department Manager in the pillows and blankets section and stated that she thought he would be "a great fit" for the position. Plaintiff expressed interest in working for BB&B and Ms. Brown told Plaintiff she would schedule an interview immediately.

35.    In the third week of September 2012, Plaintiff had an interview with a hiring manager, Francis, at the BB&B store located at 410 East 61st Street, New York, New York 10065.

36.    During the interview, Francis asked Plaintiff a series of questions from a questionnaire. Francis spoke with Plaintiff about the Department Manager position informing Plaintiff that the hours would be sporadic requiring him to start at 7:00 a.m. on some days and to close at 12:00 a.m. on holidays, that he would be required to work forty hours or more per week and would receive a salary of $47,000.00. Francis told Plaintiff she wanted to hire him but that Plaintiff would have to meet with the store manager for final approval.

37.    Following the interview, Plaintiff met with the store manager of the BB&B at 410 East 61st Street. The store manager spoke with Plaintiff for ten to fifteen minutes and told Plaintiff he was hired and would start at BB&B Broadway on October 1, 2012.

### *Description of BB&B Broadway*

38.    At the time Plaintiff was hired, BB&B Broadway was divided into two primary sections. The first floor was considered the soft side, consisting of sections for pillows, blankets, candles, towels and bath products. The second floor was considered the hard side and consisted of kitchen products.

39.    On the first floor, where Plaintiff was hired to work, there were more than thirty sales-floor associates and numerous managers and supervisors. The following is a list of the relevant parties on the first floor and their positions.

a.   Store Manager:          Kellie Marsalli

7

b.  Senior Managers:          Lynette Riley and Nery Casiana

c.  Department Managers:   Plaintiff, Indiana Peguero and Glenys

d.  Training Manager:          Shalema McGhee

e.  Supervisor:                     Maribel Garcia

f.  Associates

g.  HR Manager:                  Suzanne Ferrence

### *Duties*

40.     As a Department Manager, Plaintiff's duties included, without limitation, the following: monitoring sales, preparing the department for store opening, cleaning the store on closing shifts, maintaining the cleanliness and organization of the department, online orders and deliveries, merchandising, stock, inventory, customer service, etc.

41.     Plaintiff's duties also included delegating work tasks to associates, assigning associates to work zones and registers, assisting associates with customer service, training, and ensuring policies and procedures were adhered to.

### *Family Tragedy and Religious Practice: December 2012 – February 2013*

42.     Over the course of his relationship with his fiancé, Plaintiff became very close with his fiance's mother Gloria Arango, and came to regard her like his own mother. Tragically, Ms. Arango developed cancer in 2012 and succumbed to her illness on March 16, 2013. In the three to four month period preceding her death, Plaintiff helped his fiancé take care of Ms. Arango as she became increasingly ill, losing both her eyesight and ability to speak and walk.

43.     During this period, Plaintiff went through a great deal of depression and became more involved in his religious practice. Plaintiff began attending mass and reading the Quaran more frequently, Plaintiff increased his interaction with other Muslims and began growing his

beard again in or about December 2012.

### *HR Meeting Regarding Plaintiff's Religion: February 2013*

44.     By February 2013, Plaintiff had grown and maintained his beard at the length of a fist (4-5 inches) in accordance with Muslim practice. Plaintiff further regularly groomed and trimmed his beard to ensure it did not grow beyond the length of a fist to comply with BB&B's grooming policies. Below is a photograph of Plaintiff during this period:



45.     Notwithstanding, Plaintiff was approached by Human Resources Manager Suzanne Ferrence in February 2013 and asked to come to Ms. Ferrence's office. During the meeting, Ms. Ferrence started the conversation by asking "what's going on with the beard?" Plaintiff responded that he was growing his beard as part of his religious practice, that it would be maintained and groomed and would not be grown beyond a fist in length. Ms. Ferrence asked what Plaintiff's religion was and Plaintiff advised her he was Muslim.

46.     Plaintiff then asked Ms. Ferrence why he was being questioned about his religion and Ms. Ferernce stated that "inquiring minds want to know." In response, Plaintiff asked who the inquiring minds were. Ms. Ferrence informed Plaintiff that store manager, Defendant Marsalli,

9

wanted to know. Upset by this conversation, Plaintiff left the room.

### *Nicknamed "Terrorist": February 2013 – March 2013*

47.     Following the Human Resources meeting in February 2013, supervisor Maribel Garcia called out to Plaintiff "hey terrorist". Plaintiff responded to Ms. Garcia "please don't play around like that." Nevertheless, Ms. Garcia continued to call Plaintiff "terrorist" rather than by his name.

48.     Statements by Ms. Garcia referring to Plaintiff as a terrorist included, without limitation, the following:

- "Hey terrorist";

- "How are you terrorist?";

- "Good morning terrorist";

- "Can you help me terrorist?"; and

- "Hey terrorist come over here"

49.     Plaintiff worked with Ms. Garcia approximately three to five days per week throughout his employment. Each day Plaintiff worked with Ms. Garcia, Plaintiff was called a terrorist four to five times on average.

50.     Furthermore, Ms. Garcia regularly called Plaintiff a "terrorist" out loud on the sales floor in front of other employees, management and even customers causing Plaintiff great humiliation.

51.     Plaintiff repeatedly told Ms. Garcia "do not call me that" and that his name is Jose and he would like to be called by his name. Despite repeated warnings, Ms. Garcia continued to call Plaintiff "terrorist".

10

52.     Additionally, Plaintiff overheard various conversations in which Ms. Garcia huddled with sales-floor associates and the term "terrorist" was referenced.

53.     In or about March 2013, training manager Shalema McGhee also began calling Plaintiff "terrorist". Like Ms. Garcia, Ms. McGhee did not listen to Plaintiff's repeated requests to stop calling him "terrorist".

54.     Moreover, Ms. McGhee had various inappropriate and offensive conversations with Plaintiff during his employment, and asked, without limitation, the following:

- "Why don't you believe in God?";

- "Why aren't you Christian or Catholic?";

- "What do you guys eat?"; and

- "What are your guys' holidays?"

### Complaint to Human Resources: March 2013

55.     Greatly disturbed by the treatment he was being subjected to, Plaintiff went to Human Resources and met with Ms. Ferrence. Plaintiff advised Ms. Ferrence that Ms. Garcia and Ms. McGhee were continually calling Plaintiff "terrorist" in front of other employees and customers. Plaintiff expressed how offended and ashamed this was making him and stated to Ms. Ferrence that "something has to be done about it." Ms. Ferrence responded to Plaintiff, "Don't worry it will get taken care of." Upon information and belief, Ms. Ferrence did not write down or make any written record during this conversation.

56.     Following the meeting, Ms. Garcia and Ms. McGhee continued to call Plaintiff "terrorist" and there was no indication that Ms. Garcia and Ms. McGhee were warned, subjected to disciplinary action or even questioned regarding the incidents.

57.     Realizing his complaint fell on deaf ears, in or about March 2013, Plaintiff approached the operations manager Doug. Plaintiff notified Doug that he was consistently being called a "terrorist" by Ms. Garcia and that HR took no corrective action after Plaintiff's complaint. Doug responded to Plaintiff, "Don't worry about it she's just playing around."

58.     As no action was taken, Plaintiff was continually called "terrorist" by Ms. Garcia and Ms. McGhee until the end of his employment. Further, three sales-floor associates, Amanda, Baron and Josue, also began partaking and referred to Plaintiff as a "terrorist".

### Second HR Meeting: June 2013

59.     In or about June 2013, Ms. Ferrence called Plaintiff down to HR for a second meeting.

60.     Ms. Ferrence stated to Plaintiff, "Let's talk about your religion off the record". Ms. Ferrence then asked, "About the Muslim thing, are you seriously following the Muslim religion?"

61.     Plaintiff stated to Ms. Ferrence, "Why are you asking me this again?" Ms. Ferrence responded to Plaintiff "I keep getting harassed by Kellie about the beard." Plaintiff then advised Ms. Ferrence to let Kellie know that "I'm still following my religion and there is no problem with my beard."

### Change in Treatment by Store Manager: February 2013 – January 2014

#### Prior to HR Meeting in February 2013

62.     Prior to the HR meeting in February 2013, store manager Kellie Marsalli was friendly, cordial and professional with Plaintiff. Defendant Marsalli often engaged in conversations with Plaintiff and showed him pictures of her cat, "Mr. Whiskers".

63.     Significantly, Defendant Marsalli discussed on numerous occasions promoting Plaintiff into the senior management position. Upon information and belief, such a promotion

would have entailed a substantial increase in salary.

64.     Further, Defendant Marsalli often commended Plaintiff on his performance and advised Plaintiff of when he received a "shout out". A shout out at BB&B was when a customer complimented an employee for their service and the same was acknowledged over walky talky.

*Following HR Meeting in February 2013*

65.     Following the HR meeting and Plaintiff's growth of his beard in accordance with religious practice, Defendant Marsalli became short tempered, abrupt and extremely hostile towards Plaintiff. Defendant Marsalli no longer engaged in conversations with Plaintiff and did not show him pictures of her cat Mr. Whiskers.

66.     Moreover, Defendant Marsalli began to constantly criticize and disparage Plaintiff's work and no longer advised Plaintiff of shout outs. Such treatment grew progressively worse until Defendant Marsalli terminated Plaintiff's employment.

67.     In or about September 2013, the district manager visited BB&B Broadway and met with Plaintiff and Defendant Marsalli. The district manager notified Plaintiff and Defendant Marsalli of various tasks he wanted completed by the next Friday. After the district manager left, Defendant Marsalli told Plaintiff to have the tasks completed by Monday. Plaintiff responded that the weekends were extremely busy in the store and that it would be almost impossible to accomplish with the volume of customers. Defendant Marsalli told Plaintiff she did not care and that it needed to be done by Monday.

68.     In or about November or December 2013, senior manager Lynette Riley resigned, was terminated or was transferred from her position as senior manager and Nery Casiana (hereinafter referred to as "Mr. Casiana") took over Ms. Riley's position.

69. Plaintiff was not offered or considered for the position solely based upon his status as a practicing Muslim.

### *Pre-Textual Write-Up and Performance Evaluation October 2013 – December 2013*

70. According to Mr. Casiana, Defendant Marsalli "had it in for" Plaintiff and Defendant Marsalli always seemed to find fault with Plaintiff's work.

71. In or about September 2013, Plaintiff was late to work one afternoon because of a misunderstanding of the schedule. Upon information and belief, on or about October 8, 2013, Mr. Casiana was instructed by Defendant Marsalli to issue a time and attendance write-up to Plaintiff based upon the lateness. According to Mr. Casiana, he was uncomfortable issuing the write up to Plaintiff under the circumstances because of the misunderstanding. Furthermore, Mr. Casiana was required to list on the write-up all of the dates Plaintiff was absent from work despite Plaintiff using his sick and vacation time on each date.

72. In or about December 2013, Mr. Casiana was required to write an annual performance review regarding Plaintiff. Mr. Casiana determined Plaintiff's employment to be satisfactory and without issue. After completion of the performance evaluation, Mr. Casiana was required to submit the same to Defendant Marsalli.

73. Following her review, Defendant Marsalli directed Mr. Casiana re-write the performance evaluation as she felt Mr. Casiana was being "too fair." Significantly, Defendant Marsalli even rewrote some of the sections of the performance evaluation herself.

74. Upon information and belief, employees and managers were provided with customary raises after working at BB&B for one year. Despite excellent performance and working at BB&B over a year, Plaintiff was not provided with a raise nor was it explained why he did not receive a raise.

14

75.     Plaintiff was denied a raise solely based upon his status as a practicing Muslim.

### *Pre-Textual Termination: November 2013 – January 7, 2014*

76.     In or about November 2013, Plaintiff submitted a written request to Defendant Marsalli for vacation time from the period of December 23, 2013 through January 2, 2014. Plaintiff's request was approved by Defendant Marsalli.

77.     As per BB&B's policy, work schedules were made two weeks in advance and were not permitted to be changed without consulting with the affected employee.

78.     The <u>only</u> individual with authority to change schedules at BB&B was Defendant Marsalli.

79.     In December 2013, Plaintiff was provided with a work schedule by department manager Indiana Peguero. The schedule reflected Plaintiff's vacation time as December 23, 2013 through January 2, 2014. Additionally, the schedule stated ""VAC" (vacation) on January 4, 2014 and "OFF" on the dates of January 4th and 5th, 2014.

80.     The schedule was approved by Mr. Casiana before being provided to Plaintiff.

81.     While Plaintiff was on his scheduled vacation, the work schedule was changed by hand to cross out "VAC" and "OFF" for January 3rd, 4th and 5th, 2014, and underneath it was written "CL" (close), meaning to work the closing shift.

82.     Upon information and belief, Defendant Marsalli made these changes to the schedule.

83.     At no time was Plaintiff notified that his return date was changed to January 2, 2014.

84.     Further, while Plaintiff was off on January 3rd through 5th, 2014, Plaintiff did not receive a call from any employee at BB&B inquiring where Plaintiff was.

85.    Defendant Marsalli waited until Plaintiff's second or third day of absence to inquire about Plaintiff's whereabouts.

86.    Plaintiff returned as scheduled on January 6, 2014.

87.    On or about January 7, 2014, Plaintiff was confronted by Defendant Marsalli and terminated for being a no call no show on January 3rd through 5th, 2014.

88.    Mr. Casiana knew Plaintiff was scheduled to be off during the period of January 3rd through 5th, 2014, and Defendant Marsalli chose to terminate Plaintiff while Mr. Casiana was not present.

89.    The following is an image of the altered schedule reflecting a change of Plaintiff Jose Alcantara's schedule to cross out "OFF" and insert "CL" (closing shift) underneath:



**Damages**

90.     Due to the severe and constant harassment Plaintiff endured at BB&B, consisting of abuse and hostility, regularly being called a terrorist, questioning and denigration of his religious beliefs and practices, unwarranted criticism and targeting, an unrelenting and impermissible pattern and practice of discrimination, unfair denials of raises and promotions, orchestrated write-ups and a secretive schedule change to set up his termination, Plaintiff was caused severe emotional distress, embarrassment, humiliation, and significant financial losses.

### AS AND FOR THE FIRST CAUSE OF ACTION
(*Title VII Religious Discrimination*)

91.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

92.     Plaintiff was an employee within the meaning of Title VII of the Civil Rights Act, 42. U.S.C. § 2000e(f).

93.     Defendants' were an employer within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b).

94.     Pursuant to Title VII, 42 U.S.C. § 2000e-2(a) it is unlawful for an employer to discriminate against any individual with respect to the "compensation, terms, conditions, or privileges of employment because of such individual's . . . religion."

95.     Defendants committed numerous adverse acts against Plaintiff, including denying Plaintiff a raise, a promotion and terminating Plaintiff's employment.

96.     The motivating factor for these adverse acts was Plaintiff's religion.

97.     But for Plaintiff's religious practice, Plaintiff would not have been denied a raise, a promotion and would not have been terminated.

98.     Defendants' unlawful acts were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

99.     As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Title VII Hostile Work Environment)*

100.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

101.     Defendants engaged in activities which created a hostile working environment for Plaintiff, including, but not limited to, subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, embarrassment and humiliation, and refusing to respond to Plaintiff's demands to cease and desist from such discrimination and harassment.

102.     The treatment of Plaintiff was so severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

103.     The motivating factor for the hostile treatment of Plaintiff was Plaintiff's religion.

104.     But for Plaintiff's religious practice, Plaintiff would not have been subject to a hostile work environment.

105.     Defendants' severe and pervasive harassment of Plaintiff was intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

106.     By engaging in the aforesaid acts, Defendants engaged in an unlawful employment practice as defined by 42 U.S.C. § 2000e-2.

107.    As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer severe emotional distress, mental anguish, pain and suffering.

### AS AND FOR THE THIRD CAUSE OF ACTION
*(Title VII Retaliation)*

108.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

109.    Pursuant to Title VII, 42 U.S.C. § 20000e-3(a), it is unlawful for an employer to discriminate against an employee because the employee opposed an "unlawful employment practice" under Title VII or because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" under Title VII.

110.    By requesting a religious accommodation for his beard and complaining of harassment and discrimination based upon his religious, Plaintiff opposed an unlawful employment practice and made a charge, testified, assisted or participated in an investigation, proceeding, or hearing within the meaning of 42 U.S.C. § 20000e-3(a).

111.    By subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, denying Plaintiff a raise and promotion, and terminating Plaintiff's employment, Defendants retaliated against Plaintiff in violation of 42 U.S.C. § 20000e-3(a).

112.    Defendants' acts of retaliation were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

113.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE FOURTH CAUSE OF ACTION
(*NYSHRL Religious Discrimination*)

114.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

115.    Plaintiff was an employee within the meaning of New York State Human Rights Law, N.Y. Exec. Law § 292(6).

116.    Defendants' were an employer within the meaning of New York State Human Rights Law, N.Y. Exec. Law § 292(5).

117.    Pursuant to New York State Human Rights Law, N.Y. Exec. Law § 296, it is unlawful for an employer because of an individual's religion to "discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

118.    Defendants committed numerous adverse acts against Plaintiff, including denying Plaintiff a raise, a promotion and terminating Plaintiff's employment.

119.    The motivating factor for these adverse acts was Plaintiff's religion.

120.    But for Plaintiff's religious practice, Plaintiff would not have been denied a raise, a promotion and would not have been terminated.

121.    Defendants' unlawful acts were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

122.    As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE FIFTH CAUSE OF ACTION
(*NYSHRL Hostile Work Environment*)

123.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

124.   Defendants engaged in activities which created a hostile working environment for Plaintiff, including, but not limited to, subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, embarrassment and humiliation, and refusing to respond to Plaintiff's demands to cease and desist from such discrimination and harassment.

125.   The treatment of Plaintiff was so severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

126.   The motivating factor for the hostile treatment of Plaintiff was Plaintiff's religion.

127.   But for Plaintiff's religious practice, Plaintiff would not have been subject to a hostile work environment.

128.   Defendants' severe and pervasive harassment of Plaintiff was intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

129.   By engaging in the aforesaid acts, Defendants engaged in an unlawful employment practice as defined by N.Y. Exec. Law § 296(1).

130.   As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE SIXTH CAUSE OF ACTION
(*NYSHRL Retaliation*)

131.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

132.    Pursuant to New York State Human Rights Law, N.Y. Exec. Law § 296(7), it is unlawful for an employer to retaliate or discriminate against an employee because the employee opposed an unlawful employment practice under the NYSHRL or filed a complaint, testified or assisted in any proceeding under the NYSHRL.

133.    By requesting a religious accommodation for his beard and complaining of harassment and discrimination based upon his religious, Plaintiff opposed an unlawful employment practice and made a charge, testified, assisted or participated in an investigation, proceeding, or hearing within the meaning of N.Y. Exec. Law § 296(7).

134.    By subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, denying Plaintiff a raise and promotion, and terminating Plaintiff's employment, Defendants retaliated against Plaintiff in violation of N.Y. Exec. Law § 296(7).

135.    Defendants' acts of retaliation were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

136.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (*NYCHRL Religious Discrimination*)

137.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

138.    Pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 it is unlawful for an employer based upon the religion of any person to "discharge from employment

22

such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment".

139.   Defendants committed numerous adverse acts against Plaintiff, including denying Plaintiff a raise, a promotion and terminating Plaintiff's employment.

140.   The motivating factor for these adverse acts was Plaintiff's religion.

141.   But for Plaintiff's religious practice, Plaintiff would not have been denied a raise, a promotion and would not have been terminated.

142.   Defendants' unlawful acts were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

143.   As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (*NYCHRL Hostile Work Environment*)

144.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

145.   Defendants engaged in activities which created a hostile working environment for Plaintiff, including, but not limited to, subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, embarrassment and humiliation, and refusing to respond to Plaintiff's demands to cease and desist from such discrimination and harassment.

146.   The treatment of Plaintiff was so severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

147.   The motivating factor for the hostile treatment of Plaintiff was Plaintiff's religion.

148. But for Plaintiff's religious practice, Plaintiff would not have been subject to a hostile work environment.

149. Defendants' severe and pervasive harassment of Plaintiff was intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

150. By engaging in the aforesaid acts, Defendants engaged in an unlawful employment practice as defined by N.Y.C. Admin. Code § 8-107(1).

151. As a result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer severe emotional distress, mental anguish, pain and suffering.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (*NYCHRL Retaliation*)

152. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs with the same force and effect as if fully set forth herein.

153. Pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7). it is unlawful for an employer to retaliate or discriminate against an employee because the employee opposed an unlawful employment practice under the NYCHRL or filed a complaint, testified or assisted in any proceeding under the NYCHRL.

154. By requesting a religious accommodation for his beard and complaining of harassment and discrimination based upon his religious, Plaintiff opposed an unlawful employment practice and made a charge, testified, assisted or participated in an investigation, proceeding, or hearing within the meaning of N.Y.C. Admin. Code § 8-107(7).

155. By subjecting Plaintiff to offensive and derogatory comments, unwarranted criticisms and complaints, denying Plaintiff a raise and promotion, and terminating Plaintiff's

employment, Defendants retaliated against Plaintiff in violation of N.Y.C. Admin. Code § 8-107(7).

156.    Defendants' acts of retaliation were intentional, willful, malicious and in reckless disregard of Plaintiff's rights.

157.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and continues to suffer damages, in forms including, but not limited to, lost income, lost future earnings and severe emotional distress, mental anguish, pain and suffering.

**WHEREFORE**, Plaintiff seeks the following relief:

A.  On the First Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

B.  On the Second Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

C.  On the Third Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

D.  On the Fourth Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

E.  On the Fifth Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

F.  On the Sixth Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

G.  On the Seventh Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

H.  On the Eigth Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

I.  On the Ninth Cause of Action on behalf of Plaintiff against Defendants, for all back pay wages due, future wages, compensatory damages, punitive damages, along with all reasonable attorney fees, costs and interest, in an amount to be determined by this Court but greater than the jurisdictional minimum;

J.  Interest;

K.  Costs and disbursements; and

L.  Such other and further relief as is just and proper.

Dated: Melville, New York
      November 6, 2015

Respectfully submitted,

_____/s/_____
Matthew Madzelan, Esq. (MM-7354)
SLATER SLATER SCHULMAN LLP
Attorneys for Plaintiff
445 Broad Hollow Road, Suite 334
Melville, New York 11747
(631) 420-9300